Filed 8/18/21  P. v. Magana CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>ERICK ALEXANDER MAGANA,<br><br>     Defendant and Appellant. | B303377<br><br>(Los Angeles County Super. Ct. No. BA164867) |

APPEAL from a postjudgment order of the Superior Court of Los Angeles County, Eleanor J. Hunter, Judge.  Affirmed.

Marilee Marshall for Defendant and Appellant.

Rob Bonta, Xavier Becerra, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Amanda Lopez, and Heidi Salerno, Deputy Attorneys General, for Plaintiff and Respondent.

# I. INTRODUCTION

Defendant Erick Alexander Magana appeals from an order denying his petition for resentencing pursuant to Penal Code[1] section 1170.95. We affirm.

# II. BACKGROUND

A. *Factual Background*

We recount the factual background as stated in defendant's direct appeal (*People v. Magana* (Mar. 2, 2005, B127841) [nonpub. opn.]), supplemented by our review of the trial record. "Connie Lopez had been riding with her ex-husband in his van at approximately 3:30 or 3:45 p.m. on September 7, 1994. Their four children were also in the van. When stopped at a street light in front of Hollywood High School, Ms. Lopez saw four young men, including defendant, in a blue Camaro automobile stopped in front of them. The young men were speaking in loud voices to some young women seated on a bus bench. Ms. Lopez described the teenaged young men as saying 'bad things' to the women on the bus bench. Roland Ruiz, the victim, was standing on a grassy area behind the young women on the bus bench. Ms. Lopez testified, '[T]he driver come out and then the passenger, and then the other two followed them.' The four young men got out of the Camaro and walked up to Mr. Ruiz, all the while gesturing with their hands. The driver was gesturing with his hands. More than one of the other young men were gesturing with their hands. At trial, Ms. Lopez testified at first that the front seat

---

[1] Further statutory references are to the Penal Code.

passenger was not gesturing with his hands because he was holding a gun. (Ms. Lopez told a detective the day after the shooting that the front seat passenger with the gun in fact made hand gestures. However, that fact was not reflected in the detective's report.)[2] Three of the young men walked in front of the armed youngsters [*sic*] as they walked towards Mr. Ruiz. The driver then punched Mr. Ruiz. The three young men were 'very close' to Mr. Ruiz when the fatal shot was fired. Before being fatally shot, Mr. Ruiz was unarmed and did not have anything in his hands. The young man with the gun began pointing it at 'everybody' including Ms. Lopez. Ms. Lopez screamed at the armed youngster when he pointed the gun at her. Ms. Lopez testified, 'I thought he was going to shoot me.' The four young men then ran together northbound on Highland. Ms. Lopez later identified defendant from a photographic lineup as one of the individuals involved in the shooting. Ms. Lopez also identified photographs of the blue Camaro in which the young men had been riding.

"Testimony was also provided by Irene Ruiz and a friend, Yajaira Arias. They drove to the school in order to pick up Ms. Ruiz's brother, Mr. Ruiz, the victim. Ms. Ruiz, Ms. Arias, and Mr. Ruiz were members of a local gang. While at the corner of Selma and Highland Streets, Ms. Ruiz saw four young men running together toward her truck from the direction of the high school. The four young men were running northbound on Highland. As the four young men approached Ms. Ruiz's car, she testified, 'They asked me for a ride.' Ms. Ruiz asked where they were from. When one of the young men responded with the name of a different gang, Ms. Arias responded, 'Fuck [that gang].' The

---

2     Ms. Lopez also told the detective that the gun was chrome.

young men responded, 'Fuck [your gang].'[3]  Ms. Arias and Ms. Ruiz then started swearing at the four young men.  In turn, the four young men were swearing at Ms. Arias and Ms. Ruiz.  One of the four young men pointed a gun at Ms. Ruiz and Ms. Arias and said 'they' wanted to shoot them.[4]  One of the four young men attempted to climb into the pickup truck.  However, Ms. Ruiz drove away, turned the truck around, and attempted to run the four young men down.  Ms. Ruiz drove to a liquor store to locate members of her gang.  Thereafter, four men who were members of Ms. Ruiz's gang got into her truck.  Ms. Ruiz drove around looking for the young men who had threatened her with a gun, but was unable to find them.  Ms. Ruiz then drove to Hollywood High School to get her brother.  Ms. Ruiz saw an ambulance at the school.  Ms. Ruiz saw her brother, Mr. Ruiz, on the ground.  She later learned that her brother had been shot.  Ms. Ruiz identified two individuals from a photographic lineup as two of the four individuals who asked for a ride and then pulled a gun.  At trial, Ms. Ruiz pointed out defendant as one of the young men she saw running on September 7, 1994, but further stated, 'I don't remember because it's been a long time.'

---

[3]    Ms. Arias, Ms. Ruiz, and the victim, Mr. Ruiz, were members of the 18th Street gang.  Defendant was a member of the Mara Salvatrucha gang.  Jose Andres, who was identified by Ms. Arias as one of the men who ran away from the shooting and whose fingerprints were recovered from the Camaro, was also a member of the Mara Salvatrucha gang.  The interaction between defendant, Mr. Andres, and the other young men with Ms. Ruiz and Ms. Arias occurred in 18th Street gang territory.

[4]    Ms. Ruiz testified that the gun was black.

"Ms. Arias identified defendant's photograph from a photographic lineup, stating: "'Photo 3 is the person that I saw running away from the scene of the shooting. I saw him holding his left hand near his waistband. I thought he had a gun.'" Ms. Arias identified defendant a second time at trial as one of the young men she saw running on the day of the shooting.

"Los Angeles Police Officer Edward Sakowski responded to a radio call regarding a shooting at Hollywood High School. As he arrived at the school, he noticed a crowd of approximately 100 to 200 students on the grass and [one] person on the ground. Two school employees were administering cardio pulmonary resuscitation to the victim, Mr. Ruiz. Officer Sakowski requested assistance and [an] ambulance. Some students pointed out a blue Camaro automobile on Highland Avenue that had been involved in the shooting. The ignition on the car had been 'punched.' Officer Sakowski learned that those involved in the shooting ran northbound on Highland Avenue. An ambulance took Mr. Ruiz to the hospital where he died as the result of a single gunshot wound to the chest.

"Dionisio Grafil, a forensic print specialist with the Los Angeles Police Department recovered approximately 35 latent fingerprints from the blue Camaro. Defendant's fingerprints were found to match those of some taken from the outside driver's door.[5] Officer Gustavo Chacon was a gang investigator at the time of the shooting. Officer Chacon was familiar with the gangs in the area of Hollywood High School. Officer Chacon knew Mr. Ruiz as a member of a local gang. Officer Chacon

---

5    Mr. Andres's fingerprints matched those taken from the inside passenger-side-front window, the outside passenger-side trunk, and the outside driver's-side-rear panel, near the trunk.

5

identified defendant as a member of a rival gang in the area. Officer Chacon had previously spoken with defendant. Officer Chacon testified defendant had tattoos consistent with those worn by the local gang. Officer Chacon demonstrated the gang signs for the members of the rival gang, wherein they gestured with their hands to depict the letters of the gang." (*People v. Magana, supra*, B127841.)

B. *Trial*

On April 2, 1998, the Los Angeles County District Attorney (District Attorney) alleged in a single-count information that on September 7, 1994, defendant murdered Mr. Ruiz (§ 187, subd. (a)). The District Attorney further alleged that a principal was armed with a handgun during the commission of the murder (§ 12022, subd. (a)(1)). A jury found defendant guilty of second degree murder and found true the allegation that a principal was armed with a handgun. Defendant timely appealed, and on March 2, 2005, this court affirmed his conviction. (*People v. Magana, supra,* B127841.)

C. *Resentencing Petition*

On January 7, 2019, defendant petitioned for resentencing pursuant to section 1170.95. Defendant asserted in a form petition that: "[a] complaint, information, or indictment was filed against [him] that allowed the prosecution to proceed under a theory of . . . murder under the natural and probable consequences doctrine"; "[a]t trial, [he] was convicted of . . . 2nd degree murder pursuant to . . . the natural and probable

6

consequences doctrine"; and "[he] could not now be convicted of murder because of changes to [section] 188, effective January 1, 2019."

On April 29, 2019, defendant filed a response to the District Attorney's opposition.[6]

On June 4, 2019, the trial court issued an order to show cause why the petition for resentencing should not be granted.

On August 27, 2019, September 5, 2019, and October 1, 2019, defendant filed additional briefs in which he argued that he was eligible for resentencing.

The trial court conducted a hearing on August 27, 2019, September 24, 2019, and October 23, 2019. Neither the District Attorney nor defendant submitted additional evidence in connection with that hearing. Instead, both parties relied on the record of conviction to argue their respective positions.

On November 4, 2019, the trial court issued a minute order denying the petition. As an initial matter, the court observed that it was the prosecution's burden to prove, beyond a reasonable doubt, that defendant was ineligible for resentencing in this case because he "could be found guilty under the law as it currently exists." Based on its review of the evidence and argument of counsel, the court concluded that defendant was not eligible for resentencing because he "acted with malice when he directly aided and abetted the murder of the victim."

---

[6]     The District Attorney's opposition is not part of the record on appeal but defendant, in his April 29, 2019, filing, referenced such an opposition. Defendant conceded some uncertainty about whether the document was filed since he described it as "apparently filed and served."

The trial court then explained: "This case involved a calculated decision by two documented known gang members, [defendant] and Mr. Andres, plus two other young male Hispanics, to go on a mission into rival gang territory in a stolen car. They entered into this rival territory with at least one loaded firearm. There was evidence that there were two guns, a chrome gun used to kill the victim and a black gun used by [defendant] to threaten witnesses after the murder. They drove in and stopped at the [h]igh [s]chool right at the time when school commonly was ending which exposed many potential targets. As argued by the prosecutor, a reasonable inference from the evidence was that [defendant] was the driver of the car based on his print on the driver's door and Mr. Andres was the front passenger based on his prints on the passenger side door and a tentative photo lineup identification. [Defendant] was the first one to get out and was followed by Mr. Andres, who already had the loaded chrome firearm out as he exited the car. The driver [(defendant)] immediately started confronting the victim by making hand gestures that were consistent with flashing his gang signs. The victim didn't have anything in his hand nor did he say anything to the group to provoke them. The four approached the victim in such a calculated manner as to conceal the fact one of their number was armed with a firearm, the driver [(defendant)] and two others in front and the front passenger (Mr. Andres) slightly behind. The driver [(defendant)] diverted the victim's attention by punching him in the face causing him to fall to the ground which gave the front passenger (Mr. Andres) the opportunity to immediately [shoot] the victim while he was on the ground.[7] There was no fight, no argument, just an execution.

---

7 The record does not reflect that Mr. Ruiz fell to the ground

"The four fled the area as Mr. Andres repeatedly pointed the gun at others who were nearby. When they came across Ms. Ruiz and [Ms. Arias], [defendant] continued to claim his gang in a hostile manner. According to Ms. Ruiz, he had his own black gun which he pointed at the young women and stated 'they should shoot them too.'"

Defendant timely appealed.

## III. DISCUSSION

A. *Section 1170.95*

"Senate Bill [No.] 1437 [(Senate Bill 1437)] was enacted to 'amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § 1, subd. (f).) Substantively, Senate Bill 1437 accomplishes this by amending section 188, which defines malice, and section 189, which defines the degrees of murder, and as now amended, addresses felony murder liability. Senate Bill 1437 also adds the aforementioned section 1170.95, which allows those 'convicted of felony murder or murder under a natural and probable consequences theory . . . [to] file a petition with the court that sentenced the petitioner to

after defendant punched him. The trial court's misstatement, however, does not affect our analysis of whether the court erred in denying the petition.

9

have the petitioner's murder conviction vacated and to be resentenced on any remaining counts . . . .' (§ 1170.95, subd. (a).)

"An offender may file a petition under section 1170.95 where all three of the following conditions are met: '(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine[;] [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder[;] [¶] [and] (3) The petitioner could not be convicted of first or second degree murder because of changes to [s]ection[s] 188 or 189 made effective January 1, 2019.' (§ 1170.95, subd. (a)(1)–(3).)" (*People v. Martinez* (2019) 31 Cal.App.5th 719, 723 (*Martinez*).)

Where a petitioner files a section 1170.95 petition that contains all of the statutorily required information and requests counsel, the trial court must appoint counsel and order briefing. (*People v. Lewis* (July 26, 2021, S260598) ___ Cal.5th ___ [2021 WL 3137434, at *3–*10].) The court then evaluates whether the petitioner made a prima facie showing that he is eligible for relief. (*Id*. at *3.) If the petitioner has made such a showing, the trial court "shall issue an order to show cause." (§ 1170.95, subd. (c).)

"The trial court must then hold a hearing 'to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not . . . previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence.' (§ 1170.95,) subd. (d)(1).) . . . .

10

Significantly, if a hearing is held, '[t]he prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens.' (§ 1170.95, subd. (d)(3).) '[T]he burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.' (§ 1170.95, subd. (d)(3).) 'If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges.' (§ 1170.95, subd. (d)(3).)" (*Martinez, supra*, 31 Cal.App.5th at pp. 723–724.)

B.     *Analysis*

Defendant contends that the trial court erred by finding he was ineligible for resentencing under section 1170.95 because the prosecution failed to meet "its burden of proving beyond a reasonable doubt that [defendant] was a direct aider and abettor of the murder of Ruiz." "[T]o establish a petitioner's ineligibility for section 1170.95 relief for failure to satisfy the third condition [that '[t]he petitioner could not be convicted of first or second degree murder because of changes to [s]ection[s] 188 or 189 made effective January 1, 2019' (§ 1170.95, subd. (a)(3); *Martinez, supra*, 31 Cal.App.5th at p. 723)], the prosecutor must prove beyond a reasonable doubt the elements of first or second degree murder under the current law." (*People v. Lopez* (2020) 56 Cal.App.5th 936, 951, review granted Feb. 10, 2021, S265974.)[8]

---

[8]     We disregard defendant's argument, raised for the first time in his reply brief, that the trial court applied the wrong standard of proof at the section 1170.95, subdivision (d)(3)

11

"[W]e review sufficiency of the evidence challenges to judgments of conviction for substantial evidence. The same standard applies to the review of postjudgment orders . . . ." (*Id.* at p. 953.)

Substantial evidence supports a finding that defendant acted as an aider and abettor and with the intent to kill Mr. Ruiz. (See *People v. Chiu* (2014) 59 Cal.4th 155, 167 ["Under [direct aider and abettor] principles, the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission"]; *People v. Gentile* (2020) 10 Cal.5th 830, 850 (*Gentile*) [under direct aider and abettor theory of liability for murder, "'the aider and abettor . . . know[s] and share[s] the murderous intent of the actual perpetrator'"].) Defendant drove Mr. Andres, a fellow gang member, and two others in a stolen car into rival gang territory. Defendant and the others then approached Mr. Ruiz, a rival gang member, with defendant walking in front of the shooter, thereby concealing the shooter's gun from Mr. Ruiz's view. Defendant flashed gang signs at Mr. Ruiz and punched him immediately before the shooter shot and killed him. Defendant and the others fled the scene together and continued to demonstrate their gang allegiance by swearing at rival gang members Ms. Ruiz and Ms. Arias. This evidence supports a finding that defendant shared the shooter's intent to kill Mr. Ruiz and aided and abetted the shooting. (See *People v. Nguyen* (2015) 61 Cal.4th 1015, 1054 [among the factors which may be considered in determining whether a person has aided and abetted the commission of a

---

hearing. (*Julian v. Hartford Underwriters Ins. Co.* (2005) 35 Cal.4th 747, 761, fn. 4.)

12

crime are "'presence at the scene of the crime, companionship, and conduct before and after the offense'"].)  A direct aider and abettor is liable for murder notwithstanding changes made by Senate Bill 1437 and thus is ineligible for relief under section 1170.95.  (See *Gentile*, *supra*, 10 Cal.5th at p. 848.)  The trial court therefore did not err in denying defendant's petition for resentencing.

## IV.  DISPOSITION

The order denying the section 1170.95 petition is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KIM, J.

We concur:

RUBIN, P. J.

MOOR, J.